UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:19-cv-130-MOC-WCM

| | | |
|---|---|---|
| MELISSA KNIBBS, *as personal representative of the Estate of* Michael Scott Knibbs, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| | ) ) | **ORDER** |
| ANTHONY MOMPHARD, JR., *individually and in his official capacity as a deputy sheriff of the Macon County Sheriff's Department,* ROBERT HOLLAND, *in his official capacity as the Sheriff of Macon County,* WESTERN SURETY COMPANY, *a South Dakota Corporation,* THE OHIO CASUALTY INSURANCE *a New Hampshire Corporation,* | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by

Defendants, (Doc. No. 26).

## I.  BACKGROUND

### A.  PROCEDURAL BACKGROUND

In the early morning hours of Sunday, April 29, 2018, Macon County Sheriff's Deputy

Anthony Momphard, Jr., shot and killed Michael Scott Knibbs.  (Doc. No. 5 at ¶¶ 33–34, 83).

The shooting occurred after Momphard perceived that Knibbs pointed a shotgun at Deputy

Momphard's face or upper chest area through a window at Knibb's residence while Deputy

1

Momphard was right outside the window on Knibbs' porch. (Doc. No. 5; Momphard Dep., pp. 125–26, 180–81, 229). This lawsuit followed.

Knibbs' widow Melissa Knibbs filed her original Complaint on April 16, 2019. (Doc. No. 1). Plaintiff filed her Amended Complaint on May 2, 2019, (Doc. No. 5), alleging seven causes of action: (1) a so-called Monell claim under 42 U.S.C. § 1983 ("Policy, Custom or Usage of Macon County Sheriff"); (2) claim for a violation of Plaintiff's Second, Fourth, and Fourteenth Amendment rights, under 42 U.S.C. § 1983, against Defendant Momphard; (3) wrongful death against Defendant Robert Holland, the Macon County Sheriff, pursuant to North Carolina state law; (4) wrongful death against Defendant Momphard pursuant to North Carolina state law; (5) a violation of the North Carolina Constitution against Defendant Holland in his official capacity; (6) a violation of the North Carolina Constitution against Defendant Momphard; and (7) punitive damages under North Carolina law against Defendant Momphard in his individual capacity. Plaintiff has also named as Defendants two surety bond companies, Western Surety Company and the Ohio Casualty Insurance Company. Defendants filed their Answer to the Amended Complaint on July 5, 2019, denying liability and asserting various affirmative defenses. (Doc. No. 14).

On July 29, 2019, the Court entered a Pretrial Order and Case Management Plan (Doc. No. 16), which was modified on October 24, 2019, (Doc. No. 21) and further amended on January 21, 2020. (Doc. No. 24). Defendants timely filed their summary judgment motion on May 21, 2020. (Doc. No. 26). On June 18, 2020, Plaintiff filed a response in opposition to the summary judgment motion. (Doc. No. 32). Defendants filed a Reply on July 9, 2020. (Doc. No. 36). Finally, this Court held a hearing on the summary judgment motion on August 25, 2020. Thus, this matter is ripe for disposition.

2

**B. UNDISPUTED FACTS**

On Sunday, April 29, 2018, at around 11:44 p.m., Shelton Freeman called the Macon County Sheriff's Office ("MCSO") regarding his neighbor Michael Knibbs and stated that Knibbs had placed boards with nails in them across their shared driveway, preventing Freeman's guests from leaving his house. (Doc. No. 5 at ¶¶ 18, 29; Freeman Dep., pp. 18, 36–37). Knibbs placed the boards in the shared driveway himself. (Doc. No. 5 at ¶ 28). Knibbs told his wife Plaintiff Melissa Knibbs and his daughter Megan Knibbs that he had placed the boards in the shared drive to slow down people driving to the home of the neighbor, Shelton Freeman, and "to keep them from going back and forth all night." (Melissa Knibbs, Dep., p. 94; Megan Knibbs Dep., pp. 36–37). Megan Knibbs testified that although the neighbors and their guests going up and down the road all night was a frequent issue, the Knibbs family never called and reported this to law enforcement. (Id., p. 38).

On the night of the shooting, Freeman saw the boards with nails in the road and reported to the Macon County 911 dispatcher that they could "definitely pop a tire." (Freeman Dep., p. 37). Even though the boards were in their shared driveway, they were in front of the Knibbs' house, and Freeman did not want to go down there and move the boards himself. He was scared of Knibbs because he was sometimes intoxicated and "always aggressive, verbally anyways." He decided the best course of action was to call the police. (Id., pp. 38–39). The Harris Regional Hospital of Medical Examiner's Autopsy and Toxicology Report dated 8/17/2018 confirmed Knibbs was intoxicated at the time of the shooting.[1]

Before the evening that Knibbs placed the boards with nails in the shared driveway, Freeman

---

[1] This Report is included in the SBI file and is filed under Seal.

3

had interacted with Knibbs on only two occasions even though Freeman had been Knibbs'
neighbor for approximately eight months. (Freeman Dep., pp. 4, 19–20). Regarding the first
interaction with Knibbs, which took place about one month before the shooting, Freeman had
gone outside to take his dog off the lead and Knibbs scared Freeman walking up the driveway.
Freeman's dog started barking and Knibbs told Freeman to make the dog be quiet. Freeman
responded that "he couldn't help it, the dog barks at everything." Knibbs then said, "Well, shut
your dog up or I'm going to shut your dog up." Freeman felt this was a threat to his dog, and he
went inside and left it at that. (Id., pp. 24–25). The only other interaction Freeman ever had with
Knibbs occurred when Knibbs came over one night to apologize for the earlier interaction about
the dog. Freeman believed Knibbs was trying to get into his house to see what he and his
roommates were doing, and he was very persistent about trying to get into Freeman's house, but
Knibbs wasn't allowed to come in. (Id., pp. 27–28).

There is no evidence that Freeman or his roommates ever acted aggressively toward Knibbs
or his family, ever came onto their property, ever approached the Knibbs residence during the
daytime or nighttime, or ever had any incidents, arguments, or disagreements with the Knibbs
family. According to Plaintiff, the only issue with Freeman and his roommates was a "little"
problem related to the Knibbs' dog. (Doc. No. 5; Melissa Knibbs Dep. at pp. 91–92).

When Freeman called 911 to report the boards in the shared driveway, it was not an
emergency call for service. (Doc. No. 5 at ¶¶ 31, 37, 46). Because it was not an emergency call,
Deputy Momphard did not have his blue lights activated when he responded. (Momphard Dep.
at p. 163; Holland Dep. at pp. 71–72). When Deputy Anthony Momphard responded to the call
from Freeman to 911, he was in uniform and driving a marked MCSO vehicle. (Doc. No. 5 at ¶¶
35, 37; Momphard Dep. at pp. 270, 274). His uniform included a tactical vest, a belt, gun,

4

handcuffs, "everything that a law enforcement officer has." (Momphard Dep. at p. 274). His marked patrol car had a light bar on top that could be seen in the dark, regardless of whether the blue lights are flashing. (Id. at pp. 274–75).

Deputy Momphard arrived at around 11:55 p.m. after being dispatched at 11:47 p.m. (Doc. No. 5 at ¶¶ 29, 34). He parked his marked police car in the shared dirt driveway that was used to access the Knibbs and Freeman residences. (Id. at ¶ 35). Deputy Momphard did not drive over the boards placed in the road by Knibbs because there were nails sticking up that could have popped a tire. (Momphard Dep. at pp. 86, 90–93, 95).

Deputy Momphard first went to the Knibbs residence by mistake, believing it was the location of the 911 caller, Freeman. As he approached the door he believed to be the main entrance, he announced "Sheriff's Office" two or three times. (Id. at p. 97). He did not quite make it to the door because he realized as he got closer that there were no steps so this first door he was approaching would not logically be the entrance the occupants would use. (Id. at p. 101). Realizing that the first door with no entryway steps was not likely the commonly used point of entry, Deputy Momphard approached a second door, and he noticed lights were on in the house. (Id. at pp. 97–98). After the events of that evening, it was determined that the second door Deputy Momphard approached was the back door, but he did not know that at the time. (Id.). There are three doorways to Knibbs residence, and because of the layout, Deputy Momphard was confused about which door would be considered the front door or the commonly used entrance. (Id. at p. 140).

At the second door, Deputy Momphard knocked on the door and announced loudly, "Sheriff's Office," but no one responded. (Id. at p. 98). When he received no response, Deputy Momphard thought dispatch had given him an incorrect address for the call. (Id., p. 107–08). At

5

that point, he also heard voices coming from the neighbor's house, and he walked up the driveway towards the neighbor's house and spoke with the neighbor, Freeman. (Id., p. 110). As Deputy Momphard and Freeman were speaking, Freeman noticed lights at the Knibbs residence come back on. He pointed this out to Deputy Momphard, and Momphard turned around and saw the lights on. Freeman stated to Momphard, "I told you they are awake." (Freeman Dep., p. 50).

After discussing the matter with Freeman, who provided Deputy Momphard with additional information about the boards and the fact that Knibbs had placed them in the driveway, and seeing the lights come on in the Knibbs house, Deputy Momphard walked back to the Knibbs residence to continue his investigation by attempting to speak with Knibbs. (Id., p. 111).

Deputy Momphard returned to the Knibbs residence and approached the front porch, on which yet another door (third door) was located. (Doc. No. 5 at ¶ 78; Momphard Dep., pp. 86– 87, 110–14, 120, 281). The neighbor, Freeman, had informed Deputy Momphard that the door on the front porch (the third door) was the door typically used by the Knibbs family to enter the house. (Momphard Dep., p. 159). As he approached the third door, Deputy Momphard saw lights turn off, and this caused him to believe someone was inside. (Id., p. 111). He announced "Sheriff's Office" several times. (Id., pp. 138–40, 102). Freeman, who was still outside, heard Deputy Momphard knock loudly on the door when he was on the Knibbs' porch, and also heard Momphard loudly announce "Sheriff's Office." "He definitely announced himself" and did so in a "loud voice." (Freeman Dep., p. 53). Momphard announced "Sherriff's Office" so loudly that Freeman believes his roommates heard this, too. (Id.).

On the evening of the incident, in addition to Knibbs, there were four other family members in the residence including Knibbs' wife, Plaintiff Melissa Knibbs; their minor son, S.K.; their

adult daughter, Megan Knibbs; and Megan Knibbs' infant son. (Melissa Knibbs Dep., pp. 36–37). Megan Knibbs did not hear anything that evening that preceded the first or second shot by Deputy Momphard. (Megan Knibbs Dep., p. 23). The minor son S.K. also did not hear anything that preceded shots being fired. (S.K. Dep., pp. 11–12).

Knibbs and Plaintiff were in bed as Deputy Momphard re-approached their residence. They were both awake, and they both heard someone outside. Their bedroom window and bed were adjacent to the front porch steps where Deputy Momphard announced his presence as a deputy sheriff. They were both on the side of the bed closest to the porch where Deputy Momphard was located. (Melissa Knibbs Dep., pp. 44–47).

Plaintiff heard Deputy Momphard announce himself as a Sheriff's Deputy. (Id., p. 46). Knibbs also heard Deputy Momphard announce himself as a Deputy Sheriff and responded by picking up a shotgun and stating to Plaintiff, "Anyone could say they are a deputy." (Id., p. 47–48). Knibbs then exited the bedroom, where Plaintiff remained, and racked a shell into the chamber of his shotgun. Plaintiff heard her husband rack a shell into the chamber of the shotgun. (Id., pp. 48–49).

After Knibbs exited the bedroom and racked a shell into the chamber of his shotgun, Plaintiff heard Deputy Momphard state, at least once, "Put your weapon down." (Id., pp. 49–50). Neighbor Shelton Freeman also heard Deputy Momphard yelling loudly, "Put it down!" at least two to three times before he heard shots being fired. (Freeman Dep., pp. 54–55). He also saw Knibbs' head or shadow before shots were fired. (Id., pp. 62-64, 79–82).

Deputy Momphard was on the top step, stepping onto the porch that led to the front door when he heard the rack of a shotgun. Knibbs racked the shotgun as soon as Deputy Momphard announced "Sheriff's Office" for the second time. (Momphard Dep., p. 178). Deputy

7

Momphard yelled, "Drop it" three times, and moved to the right edge of the doorway. He drew his service weapon in his right hand and also removed his flashlight from his duty belt, holding it in his left hand. He made the decision to move to his left, across the living room window, in an effort to get off of the porch and seek cover. (Id., pp. 123–25, 140, 177–79). Deputy Momphard did not intend to engage Knibbs; he just wanted to get off the porch and find cover. (Id., pp. 141, 211–12). Deputy Momphard believed he would have been shot and killed staying in front of the doorway. He also believed passing by the window was a "fatal frontal," but he thought it was more likely he could get off the porch more quickly by passing by the window and running off the porch. (Id., pp. 141, 210–11).

Deputy Momphard turned on his flashlight as he crossed the window and illuminated Knibbs, who was standing in the window holding a shotgun pointed at Deputy Momphard's face or upper chest area. Knibbs had not dropped his shotgun as he had been ordered to do. (Momphard Dep., pp. 187–88). According to Deputy Momphard, he and Knibbs were so close that they could have touched had it not been for the window. (Id., pp. 186). Momphard fired his weapon six times. (Id., pp. 179–83). Knibbs' wounds were fatal, and he died at the scene. (Ex. 7, Attachment B, p. 2). A loaded, 12-gauge shotgun was found lying on a rug in front of the front door, near the living room window where Deputy Momphard had been standing on the other side. The shotgun was loaded with four rounds in the magazine and one in the chamber.

Defendants contend that Deputy Momphard's use of deadly force was consistent with the MCSO use of force policy. Deputy Momphard was cleared of any criminal wrongdoing related to the Knibbs incident by the North Carolina State Bureau of Investigation and the Macon County district attorney. He also was cleared of any policy violations by the MCSO based on the subsequent administrative investigation conducted by MCSO Internal Affairs. (Ex. 12 to

8

Momphard Dep., p. 2).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 129 S. Ct. 2658,

9

2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.    DISCUSSION

### A.  PLAINTIFF'S SECTION 1983 CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

#### 1.  Qualified Immunity

Plaintiff brings various constitutional claims against Defendants in their individual capacities through Section 1983, including claims for a violation of Plaintiff's Second, Fourth and Fourteenth Amendment rights.[2]  (Doc. No. 5 at ¶ 112).  For the following reasons, the Court finds that Plaintiff's Section 1983 claims fail because Defendants are entitled to qualified immunity.

#### a.  Fourth Amendment Claim

First, in Counts II and VI, respectively, Plaintiff alleges that Deputy Momphard subjected Knibbs to excessive force in violation of the Fourth Amendment to the United States Constitution and Article I of the North Carolina Constitution, Sections 1, 19, 21, 23, and 30.  (Doc. No. 5 at ¶¶ 114, 152).[3]  Excessive force claims against law enforcement officers are analyzed under the Fourth

---

[2]  Plaintiff also purports to bring the Section 1983 claims against Defendant Momphard in his official capacity as well.  Official capacity suits are not suits against the person of the defendant, but rather, are suits against the office or entity of which the defendant is an agent.  See Kentucky v. Graham, 473 U.S. 159, 165 (1985); Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  An official capacity claim is, therefore, actually nothing more than a claim against the governmental entity by whom the official is employed.  Kentucky, 473 U.S. at 165–67 (noting that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent.").  Thus, the Section 1983 claims against Deputy Momphard in his official capacity are dismissed.

[3]  The North Carolina Constitution is co-extensive with the United States Constitution on the issue of excessive force and the due process and equal protection clauses of the U.S. Constitution.  See Little v. Smith, 114 F. Supp. 2d 437, 445 (W.D.N.C. 2000).

Amendment's reasonableness standard.  Graham v. Connor, 490 U.S. 386, 395 (1989).  The question under the totality of the circumstances is "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."  Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001).  In determining whether a reasonable officer on the scene would have used force, courts are to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.  An officer may reasonably "use deadly force when the officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'"  Anderson, 247 F.3d at 129 (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)).  "[T]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.  Courts must consider "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."  Id. at 397.  Courts are also instructed to focus "on the circumstances at the moment force was used and on the fact that officers on the beat are not afforded the luxury of armchair reflection."  Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Officials who are sued for civil damages are entitled to qualified immunity unless (1) the complaint sufficiently alleges a violation of a constitutional right, and (2) the right at issue, defined at the appropriate level of

11

generality, was "clearly established" at the time of the alleged misconduct. Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010).

A constitutional right is clearly established where "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). "[I]f there is a legitimate question as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." Martin v. Saint Mary's Dep't of Soc. Servs., 346 F.3d 502, 505 (4th Cir. 2003) (internal quotation marks omitted). It is within the court's discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Doe ex rel. Johnson, 597 F.3d at 169 (quoting Pearson, 555 U.S. at 236).

Here, based on the information he had available to him at the time and the totality of the circumstances, it was reasonable for Deputy Momphard to believe that his life was in serious danger based on Knibbs' actions. Momphard re-approached the Knibbs' residence after speaking with Freeman, who had reported that Knibbs had placed boards with nails in them over their shared driveway.[4] Momphard loudly announced his presence as "Sheriff's Office."

_____

[4] North Carolina law criminalizes willful damage to personal property. See N.C. GEN. STAT. §14-160. It is also unlawful in N.C. to attempt to commit a misdemeanor or felony. See N.C. GEN. STAT. § 14-2.5. Deputy Momphard's sworn testimony reflects he had reasonable suspicion that Knibbs' act of placing the boards in the road may have constituted willful and wanton damage to property or attempt to damage property. (Momphard Dep., pp. 87–92). Thus, the Court agrees with Defendant that Deputy Momphard did have a reasonable suspicion that a crime had been committed. Plaintiff describes the action of placing the board across the road as merely a civil property dispute, and Plaintiff suggests that Deputy Momphard's act of going to the Knibbs' property to investigate was therefore not appropriate and certainly did not warrant the resulting use of deadly force. Although the Court agrees with Plaintiff that placing boards with nails over a shared driveway does not constitute a dangerous crime, this does not mean that Deputy Momphard's subsequent use of deadly force was unreasonable. Rather, application of

12

Immediately after his second announcement of "Sheriff's Office," he heard the distinct sound of a shotgun being racked just on the other side of the wall. He then shouted three times "drop it," but nothing indicated the person in possession of the firearm had complied. In his efforts to escape and seek cover, he drew his service weapon, took out his flashlight, crossed in front of the window to get off the porch, and shined the flashlight in as he did so. Deputy Momphard asserted that he believed he would have been shot and killed if he stayed in front of the doorway. He also asserted that he believed that while passing by the window was a "fatal frontal," it was more likely that he could get off the porch more rapidly by quickly passing by the window and running off the porch. Additionally, Deputy Momphard's efforts to seek cover when confronted by Knibbs' display of deadly force was consistent with his law enforcement officer training.

Thus, it is undisputed that Knibbs was armed with a shotgun and he racked a shotgun shell into the chamber just moments before he and Deputy Momphard were standing feet away from each other, face-face, with only a window between them. Deputy Momphard asserts that he saw Knibbs pointing the shotgun directly at his face or upper chest. Here, for the Court to find that Deputy Momphard is not entitled to qualified immunity under the undisputed facts of this case, this Court would have to hold that it is clearly established that use of deadly force was not allowed. Again, the undisputed facts show that Deputy Momphard was standing outside the window of a house in the dark after investigating an alleged property crime by the home owner, Knibbs. He twice announced his presence as "Sheriff's Office," he heard a shotgun shell being racked into the chamber, and he ordered Knibbs to drop the gun, but Knibbs refused to drop the

---

the other relevant <u>Graham</u> factors—including the fact that Knibbs had racked his shotgun and was ignoring Momphard's commands to put the gun down right before he was shot—leads to the conclusion that Deputy Momphard's subsequent use of deadly force was reasonable.

13

gun. Deputy Momphard then perceived that he saw a shotgun pointed directly at his face or upper chest from just feet away. Afraid that his life was in danger, Deputy Momphard shot and killed Knibbs. Under these facts, it was not clearly established that deadly force could not be used. In other words, there is certainly no bright-line rule that would hold that a Fourth Amendment constitutional violation occurred under the circumstances of this shooting. Even in deadly force cases much less compelling than this, the Court has ruled in favor of officers as a matter of law. See, e.g., Sigman v. Chapel Hill, 161 F.3d 782, 786 (4th Cir. 1998) (question of fact did not exist as to the reasonableness of the officers' perceptions despite evidence that Sigman was not armed or exhibiting threatening behavior at the time he was shot); Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (reversing the denial of the officers' summary judgment motion despite the fact that it was determined, after the plaintiff was shot in the face, that the plaintiff was not, as the officers believed, armed with a weapon). The Constitution is not blind to "the fact that police officers are often forced to make split-second judgments," which is exactly what Deputy Momphard was forced to do that when confronted by Knibbs aiming a shotgun at his face or upper chest. See Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014). As the Fourth Circuit has instructed:

> No citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life ... the Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self-protection.

Lee v. Bevington, 647 F. App'x 275, 283 (4th Cir. 2016).

In opposing Defendants' summary judgment motion, Plaintiff alleges that Defendants are

ignoring a key, disputed material fact in this case—that is, whether Mr. Knibbs was actually pointing his firearm at Deputy Momphard when Momphard shot him. Plaintiff's proposed expert, Dr. Arden, a forensic pathologist, has submitted an expert report, opining as follows:

> It is my opinion, more likely than not, based upon my education, training, experience, and review of the evidence in the case, with a reasonable degree of medical certainty, Mr. Knibbs was holding his shotgun left-handed with his right hand and arm across his chest in a safe stance with the barrel pointed upward, and the muzzle of the shotgun was not aimed at Mr. Momphard.

(Ex. 11, p. 13). Plaintiff contends that the physical evidence wholly contradicts Deputy Momphard's imagined version of the events—that Knibbs was standing in a right-handed shooting stance, with the barrel of his shotgun pointed at the window. Dr. Arden has opined that if Knibbs were in a:

> . . .right-handed shooting stance aiming the shotgun toward the window, then his left side would have been facing the window, and thus the bullets fired by Mr. Momphard would have struck him in his left side or left arm, and would have followed trajectories predominantly to his right. However, his entrance wounds were on his right, with trajectories to his left, the exact opposite of what would have obtained had he been in a right-handed shooting stance. Therefore, the testimony and demonstration by Mr. Momphard that Mr. Knibbs was in a right-handed shooting stance is inconsistent with the forensic evidence.

(Ex. 11, p. 4). Plaintiff, therefore, contends that Deputy Momphard wrongly perceived that Knibbs was in a right-handed shooting stance and that Knibbs was pointing the gun at him. Plaintiff argues that the testimony of Plaintiff's experts creates a material issue of fact as to whether Deputy Momphard reasonably perceived that his life was in danger. Plaintiff's experts have concluded that Knibbs was not pointing the gun directly at Deputy Momphard when Momphard shot and killed him.

Plaintiff also offers the testimony of expert witness Hal Sherman, an expert in crime scene investigation analysis, who has opined that Deputy Momphard's descriptions of where he

was standing on the porch and how close he was to the window are inconsistent with the evidence, which shows that the distance between Knibbs and Momphard was likely more than six feet.

To rebut Plaintiff's proposed expert witness Dr. Arden, Defendant Momphard has submitted his own expert Rod Englert, a professional crime scene reconstructionist, who has opined that, based on his review of all of the above, the physical and forensic evidence, and his training and experience, "at the time Mr. Knibbs was shot, he was in a left-hand shooting stance with the shotgun held at his chest level, the barrel pointed outward/horizontal, and canted slightly left/counter clockwise. The evidence does not support Mr. Knibbs being in a safety position with the barrel pointed at the ceiling at the time he was shot."

The Court disagrees with Plaintiff that Plaintiff's expert witnesses' testimony has created a genuine issue of disputed fact precluding summary judgment. First, the possibility of confusion or misperception by an officer who then applies deadly force in part based on his confusion or misperception need not signify a difference of triable fact. "What matters is whether the officers acted <u>reasonably</u> upon the [information] available to them and whether they undertook an objectively <u>reasonable</u> investigation with respect to that information in light of the exigent circumstances they faced." <u>Gooden v. Howard Cty.</u>, 954 F.2d 960, 965 (4th Cir. 1992) (en banc) (emphasis added). In other words, even assuming that Deputy Momphard misperceived that Knibbs' gun was pointed directly at him, and assuming that, in fact, the gun was pointed more toward the ceiling, Deputy Momphard did not have to detect that Knibbs was actually aiming and pulling the trigger before Deputy Momphard used deadly force to protect his own life. <u>Accord</u> <u>McLenagan v. Karnes</u>, 27 F.3d 1002, 1007–08 (4th Cir. 1994) ("We will not second-guess the split-second judgment of a trained police officer merely because that judgment

16

turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others."); Sigman, 161 F.3d at 787–88 ("Notwithstanding the possibility of a dispute about whether a knife was actually in Sigman's hand at the moment of the shooting, Officer Riddle . . . acted on the perception that Sigman had a knife in his hand. Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently—and potentially still is—armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable. Accordingly, we reject the argument that a factual dispute about whether Sigman still had his knife at the moment of shooting is material to the question of whether Officer Riddle is entitled to the protections of qualified immunity in the particular circumstances of this case.").

In addition to Deputy Momphard's observation of Knibbs pointing a loaded shotgun at him, the undisputed facts show the following: (1) Knibbs was armed with a loaded shotgun in close proximity to Deputy Momphard; (2) Knibbs had gotten out of bed and taken the shotgun with him after hearing Deputy Momphard announce his presence; (3) Deputy Momphard heard Knibbs rack a shotgun shell into the shotgun after Deputy Momphard had twice loudly announced his presence as a Sheriff's Deputy; (4) Plaintiff heard Knibbs rack a shell into the shotgun after they both heard Deputy Momphard announce his presence as a law enforcement officer; (5) Plaintiff (who was in the bedroom of the house) and the neighbor, Freeman (who was positioned down the roadway away from the Knibbs' house) both heard Deputy Momphard loudly announce his presence; (6) Deputy Momphard was in uniform and readily recognizable as a law enforcement officer; (7) Knibbs refused to drop the shotgun despite repeated commands by Deputy Momphard that he do so; (8) Plaintiff and the neighbor, Freeman, both heard Deputy

Momphard ordering Knibbs to drop the shotgun; and (9) due to the configuration of the porch, Deputy Momphard was in a position where he had no cover to protect himself if Knibbs were to shoot at him. Any objective officer faced with these facts would have sound reason to believe that Knibbs posed a threat of death or serious physical harm to him. See Lee v. City of Richmond, Va., 100 F. Supp. 3d 528, 542 (E.D. Va. 2015) (quoting Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996)) ("[T]he Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection."); see also Anderson v. Russell, 247 F.3d at 131 ("The evidence establishes that immediately before Russell fired, Anderson was reaching toward what Russell believed to be a gun. Any reasonable officer in Russell's position would have imminently feared for his safety and the safety of others. This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action.") (emphasis added). Thus, based on the undisputed facts, Deputy Momphard is entitled to qualified immunity as to Plaintiff's Fourth Amendment excessive force claim.[5]

**b. Second Amendment Claim**

Plaintiff also purports to bring a Second Amendment claim against Deputy Momphard by alleging that he deprived Knibbs of his right to bear arms in his own home. (Doc. No. 5 at ¶ 115). The right to bear arms under the Second Amendment applies to both the federal and state

---

[5] Although the Court is basing its dismissal on qualified immunity, the Court's analysis also leads to the conclusion that there was no Fourth Amendment violation in the first instance.

18

governments. See District of Columbia v. Heller, 554 U.S. 570 (2008); McDonald v. City of Chicago, Ill., 561 U.S. 742, 749–50 (2010). Very few cases address the issue presented by Plaintiff's Second Amendment claim. However, those that do hold that an individual's Second Amendment right to bear arms does not trump an officer's right to self-preservation. See Schaefer v. Whitted, 121 F. Supp. 3d 701, 711 (W.D. Tex. 2015) (holding that the Second Amendment right to bear arms does not outweigh officer's right to safely conduct an investigation of a crime at an individual's home and noting that this balance must be struck under the Fourth Amendment's objective reasonableness standard and Graham v. Conner); Heyward v. Tyner, No. 217CV01545DCNMGB, 2017 WL 9673667, at **6–7 (D.S.C. Nov. 29, 2017), report and recommendation adopted, No. 2:17-01545-DCN, 2018 WL 1391434, at *7 (D.S.C. Mar. 20, 2018) (declining to "transform an excessive force claim into a novel Second Amendment claim" because the officer's conduct has been recast as being caused by the plaintiff's exercise of his right to bear arms); Howe v. City of Enter., No. 1:15CV113-JA-SRW, 2018 WL 8545947, at **33–34 (M.D. Ala. Sept. 17, 2018), report and recommendation adopted sub nom., Howe v. City of Enter., Al., No. 1:15CV113-ECM, 2019 WL 8723922 (M.D. Ala. Mar. 12, 2019) (same); Spry v. West Va., No. 2:16cv01785, 2017 WL 440733, at *7 (S.D. W. Va. Feb. 1, 2017) (where Plaintiff's Second Amendment claim is based on the police shooting itself, the Second Amendment does not give rise to a cause of action; rather, the Fourth Amendment provides appropriate source of claim and analysis).

To defeat qualified immunity, Plaintiff has the burden of demonstrating the Second Amendment right Deputy Momphard is alleged to have violated is "clearly established" in a particularized sense, such that "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." See Anderson v. Creighton,

19

483 U.S. 635, 640 (1987). Here, there is no clearly established law in the Fourth Circuit, or apparently elsewhere, that would even put Deputy Momphard on notice that his actions implicated the Second Amendment. Deputy Momphard had reasonable suspicion to believe a crime may have been committed and reasonable suspicion to believe that Knibbs was the person who committed the crime. The boards with nails in the shared driveway could have caused property damage and were preventing Freeman's guests from departing. Further, Deputy Momphard was lawfully present on Knibbs' front porch, seeking to investigate Knibbs' criminal activity of placing boards with nails in the shared driveway. See United States v. Miller, No. 18-4796, 2020 WL 1873332, at *6 (4th Cir. Apr. 15, 2020) ("Although the knock-and-talk doctrine is sometimes framed as a right to approach the home by the front path, or knock on a front door, we have made clear that the implicit license is broader than that, and allows an officer to go elsewhere when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property.") (internal cites and punctuation omitted). The shooting at issue resulted when, in the course of his investigation, Deputy Momphard perceived that Knibbs pointed a shotgun directly at him after just racking the gun, and after ignoring Momphard's clear commands to put the gun down. Thus, Deputy Momphard is entitled to qualified immunity regarding Plaintiff's Second Amendment claim.[6]

### c. Fourteenth Amendment Claim

As noted, Plaintiff also purports to bring a Fourteenth Amendment substantive due process claim based Deputy Momphard's alleged use of excessive force. It is well settled that

---

[6] Plaintiff has not responded to the merits of Defendants' Motion for Summary Judgment and Memorandum of Law regarding her Second Amendment claims. Thus, it appears Plaintiff has abandoned her Second Amendment claim.

20

"claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." See Graham v. Connor, 490 U.S. at 395. Plaintiff's claim of use of excessive force must be analyzed under the reasonableness standard of the Fourth Amendment and not under the Fourteenth Amendment's Due Process Clause. Therefore, Plaintiff's Fourteenth Amendment claim fails as a matter of law.

### B. PLAINTIFF'S SECTION 1983 CLAIMS AGAINST DEFENDANT SHERIFF HOLLAND

Plaintiff also seeks to assert Section 1983 claims against Sheriff Holland in his official capacity under multiple theories, including respondeat superior, a Monell theory of purported unlawful policy, custom or usage, and supervisory liability for failure to supervise, discipline and train, as well as a policy of hiring officers who were "substandard." (Doc. No. 5 at ¶¶ 97–111). To support the Monell claim, Plaintiff offers the expert testimony of Jon Blum, an expert in law enforcement training, who has opined that Deputy Momphard was unsuitable for the position in which he was hired; that the Macon County Sheriff's Office failed to properly supervise, train, and evaluate Momphard's on-the-job performance; that Momphard failed to conform with law enforcement industry standards and his basic law enforcement training ("BLET"); and Momphard's various failures were reckless and created a false sense of urgency that resulted in Knibbs' death. Because Deputy Momphard enjoys qualified immunity on Plaintiff's excessive force claim, it follows that there can be no liability for Sheriff Holland as to any of Plaintiff's theories. See, e.g., Hinkle v. City of Clarksburg, 81 F.3d 416, 420 (4th Cir. 1996) ("In the absence of any underlying use of excessive force against [the individual officer], liability cannot

21

be placed on either the non-shooting officers, a supervisor, or the City."). Thus, Defendant Sheriff Holland is entitled to summary judgment as well.

### C. PLAINTIFF'S STATE LAW TORT CLAIMS

In Counts III and IV, Plaintiff seeks to assert state law wrongful death claims against Sheriff Holland in his official capacity and against Deputy Momphard in his individual and official capacity. First, as to Plaintiff's claims against Momphard in his individual capacity, as a public official Momphard enjoys absolute immunity from personal liability for discretionary acts done without corruption or malice. Schlossberg v. Goins, 141 N.C. App. 436, 445–46, 540 S.E.2d 49, 56 (2000); Price v. Davis, 132 N.C. App. 556, 562, 512 S.E.2d 783, 787 (1999); Meyer v. Walls, 347 N.C. 97, 489 S.E.2d 880 (1997). For purposes of the public officer's immunity analysis, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890–91 (1984). Further, courts must presume "that a public official in the performance of his official duties 'acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest.'" Lunsford v. Renn, 207 N.C. App. 298, 310, 700 S.E. 2d 94, 101 (2010) (quoting Greene v. Town of Valdese, 306 N.C. 79, 82, 291 S.E.2d 630, 632 (1982)). The presumption can only be rebutted by affirmative evidence and "[e]very reasonable intendment will be made in support of the presumption." Huntley v. Potter, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961). "[T]he burden is on [plaintiff] to overcome the presumption by competent and substantial evidence." In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551, 284 S.E.2d 470, 472 (1981). Here, the record evidence reflects nothing to indicate malice or corruption on the part of Deputy

22

Momphard, and he is entitled to public official immunity regarding the wrongful death claim.

Next, as to Plaintiff's state law tort claims against Defendants in their official capacities, "official capacity" suits are merely another way of pleading an action against the governmental entity of which the individual is an agent. Moore v. City of Creedmoor, 345 N.C. 356, 367, 481 S.E.2d 14, 21 (1997). "The doctrine of sovereign immunity bars actions against public officials sued in their official capacities. Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity." Phillips v. Gray, 163 N.C. App. 52, 56–57, 592 S.E.2d 229, 232 (2004). Governmental officials are entitled to governmental immunity unless they waive it through the purchase of insurance; however, any waiver is limited solely to the extent of insurance coverage. Satorre v. New Hanover Cty. Bd. of Comm'rs, 165 N.C. App. 173, 176, 598 S.E.2d 142, 144 (2004). "[If] the insurance policy does not indemnify the defendant against the [] acts alleged in plaintiff's complaint, defendant has not waived its sovereign immunity." Doe v. Jenkins, 144 N.C. App. 131, 135, 547 S.E.2d 124, 127 (2001).

Here, the acts complained of occurred in April 2018. During that time, Macon County had one insurance policy issued by U.S. Specialty Insurance Company risk policy number PKG80210750, which was in effect for the County as well as the Sheriff and his employees. (See Ex. 11, Aff. of Derek Roland). The North Carolina Immunity Non-Waiver Endorsement to the policy does not cover any claim or suit as to which a covered person is entitled to sovereign immunity or governmental immunity under N.C. law. The Endorsement specifically provides the policy of insurance "shall not be deemed a waiver of any statutory immunities by or on behalf of any insured, nor of any statutory limits of the monetary amount of liability applicable to any insured were this policy in effect." (See Ex. 11, Aff. of Derek Roland and attached copies). This language has been repeatedly held to preserve governmental immunity. See, e.g.,

23

Evans v. Chalmers, 703 F.3d 636, 656 (4th Cir. 2012).

### D.  PLAINTIFF'S STATUTORY CLAIM AGAINST DEFENDANTS WESTERN SURETY COMPANY AND THE OHIO SURETY COMPANY

Plaintiff has included two sureties in this action alleging these defendants are the sureties on the official bond of Defendant Holland as Sheriff of Macon County pursuant to N.C. GEN. STAT. § 162-8 and § 58-76-5.  "Where 'plaintiff does not survive summary judgment on a common law tort claim, it follows that plaintiff's statutory bond claim must also fail.'"  Nance v. Ingram, No. 7:14cv9, 2015 WL 5719590, at *8 (E.D.N.C. Sept. 29, 2015) (quoting Elliot v. Rollins, No., 5:11cv693, 2013 WL 5460193, at *2 (E.D.N.C. Sept. 30, 2013)).  Because Plaintiff has failed to produce evidence sufficient to support a tort claim against Defendants, Plaintiff's claim against the sheriff's bond must fail.

### E.  PLAINTIFF'S CLAIMS UNDER THE NORTH CAROLINA CONSTITUTION

Finally, as to Plaintiff's claims for violations of the North Carolina constitution based on excessive use of force, since the North Carolina Constitution is co-extensive with the Constitution of the United States on the issue of excessive force, the state constitutional claim must fail for precisely the same reasons.  See McNeill v. Harnett Cty., 327 N.C. 552, 563, 398 S.E.2d 475, 481 (1990) (stating that the "law of the land" clause of the North Carolina Constitution is synonymous with the due process clause of the Federal Constitution).

In addition, a plaintiff may pursue a direct action under the North Carolina Constitution only where the plaintiff lacks a remedy under state law adequate to redress the alleged violation.[7]

---

[7]  To the extent that Plaintiff purports to assert any individual capacity claims under the North Carolina Constitution, such claims are barred.  Corum v. Univ. of North Carolina, 330 N.C. 761, 787–88, 413 S.E.2d 276, 292–93 (1992).

Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 338, 678 S.E.2d 351, 354 (2009). "[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 789, 688 S.E.2d 426, 429 (2010). Plaintiff has available and adequate remedies in the form of individual capacity claims such that Plaintiff's state constitutional claim is barred. That these individual capacity claims are barred by public officer's immunity does not negate their adequacy as a remedy. DeBaun v. Kuszaj, 228 N.C. App. 567 (2013) (unpublished); Rousselo v. Starling, 128 N.C. App. 439, 448–49, 495 S.E.2d 725, 731–32 (1998). Plaintiff also has available a remedy in the form of a statutory claim against the sheriff's bond. That Plaintiff likewise cannot prevail on this claim does not negate its adequacy as a remedy. In sum, Defendants are entitled to summary judgment as to Plaintiff's North Carolina constitutional claims.

## IV. CONCLUSION

In sum, for the reasons stated herein, Defendants' summary judgment motion is granted, and all of Plaintiff's claims against all Defendants are hereby dismissed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 26), is **GRANTED**.

2. This action is dismissed with prejudice.

3. The Clerk is respectfully instructed to terminate this action.

Signed: November 5, 2020

Max O. Cogburn Jr.
United States District Judge

26